# Shearer *v.* Insurance Company of North America, Appellant.

Argued October 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Alexander Unkovic,* with him *E. O. Golden, Ralph C. John, William G. Boyle,* and *Kountz, Fry & Meyer,* for appellant.

*Charles D. Coll,* with him *Harvey H. Heilman, Jr.,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, November 24, 1959:

On May 17, 1955, Chester G. Shearer and his wife, Helena G. Shearer, owners of a seven-room brick dwelling house in North Buffalo Township, Armstrong County, purchased from the Insurance Company of North America a policy which insured their home against damage and destruction, inter alia, by explosion. On November 16, 1955, the house, according to the plaintiffs, was wrecked by an explosion which occurred 300 feet below the surface in the Cadogan Mine owned by the Allegheny River Mining Company. The Insurance Company refused to pay the indemnity claimed by the Shearers because, it said, their home was ruined not by explosion but by subsidence, a peril specifically exempted in the policy. An action of assumpsit on the policy followed and the jury returned a verdict in favor of the plaintiffs, on which judgment was entered.

The defendant insurance company has appealed, asking for judgment n.o.v., or, in the alternative, a new trial. It is unnecessary to state that in an appeal of this kind, we are to evaluate the evidence as if we had heard it through the ears of the jury since they are the exclusive judges of the credibility of the witnesses and determine whom and what to believe.

A succinct scrivener reporting on the facts established before the jury would not be in error if he summarized as follows. The plaintiffs' home is built over subterranean holdings of the Allegheny River Mining

Company. During the months of September, October, and November, 1955, that company was engaged in digging out coal deposits lying beneath the Shearer property. In extracting coal, using deep pit mining methods, it is impossible, initially, to obtain the entire quantity of coal in any given area, since pillars (about 30 feet deep) must be left to support the roof, while the digging and loading is being done. However, at a certain point, the miners retrace their steps, removing pillars as they withdraw, in this manner exhausting the entire vein. This withdrawal is known as a "retreat operation." To reclaim a pillar, it is undercut to a depth of six or seven feet, holes are drilled into the solid face of the coal, dynamite sticks or other explosives are tamped into the holes and then exploded. The pillar crumbles and the coal is taken away.

Beginning in September and continuing through November 16, 1955, the ground above the Cadogan Mine vibrated and shook to violent subterranean activity. The tremors were not of such intensity as to fracture the surface of the soil or do any considerable observable damage, although at times sleeping families were awakened from their slumbers, dishes rattled in the cupboards and windows vibrated to the invisible underground detonations. On the night of November 16, 1955, however, at about 10:20 o'clock there occurred a blast of such proportions and fury as to drive inhabitants into the streets to inquire what had happened. Many thought the furnaces in their houses had exploded. One witness described the audible and physical manifestations of violence as being one hundred times more intense than any of those experienced during the preceding two months.

In consequence of the terrestrial disturbance of November 16th the basement walls in the Shearer house cracked, walls opened up, ceilings and floors split, doors lost alignment, the porch pulled away from the

dwelling, and in other ways the house suffered vital structural damage unnecessary to relate here.

Donald Myers, assistant mine foreman for the Allegheny River Mining Company, testified that on the eventful night between 10:15 and 10:30 o'clock, mining operations in the Cadogan Mine included cutting, shooting, and loading. J. S. Schreckengast, professional mining engineer, who had been employed by the Allegheny River Mining Company for 42 years, testified to the use of explosives in the retreat operation above described. Walter F. Martz, a professional civil engineer, who examined the Shearer house after November 16th, testified, after listening to a hypothetical question embracing the salient evidence in the case, that, in his opinion, the breakage in the Shearer house was caused by an explosion.

In spite of the definitive and objective evidence supporting the proposition that the wreckage in the plaintiffs' house was due to below-surface blasting, the defendant argues that the plaintiffs may not recover unless they can exclude any other possible explanation for the calamitous event of November 16th. In this respect the appellant cites the case of *De Reeder v. Travelers Insurance Company,* 329 Pa. 328, where Chief Justice MAXEY equated the required plaintiff's proof with the proof required to support the Commonwealth's contention in a criminal case. These standards, however, are not similar. In fact, they are quite dissimilar. In a criminal prosecution the Commonwealth must establish its theorem beyond a reasonable doubt. In a civil case the plaintiff is required only to produce such quality and quantum of evidence as will preponderate, in weight and credibility, over that adduced in behalf of the defendant. The controlling ruling in civil cases was well stated recently in the case of *Smith v. Bell Telephone Co.,* 397 Pa. 134, 139: "When a party who has the burden of proof relies upon circumstantial evi-

dence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith."

In *Lear v. Shirks Motor Express*, 397 Pa. 144, 152, we also said: "A plaintiff is entitled to have his case considered by the jury even though he does not show that the only reasonable inference is that defendant's negligence was the proximate cause of the accident. It is enough that he produces evidence which may properly be found by the jury to justify an inference that the defendant's negligence was the proximate cause of the accident because such evidence outweighs even though it does not exclude an inference that the defendant was not negligent or that his negligence was not the proximate cause of the accident."

Insofar as the defendant argues that it presented evidence in opposition to the plaintiffs' claim, it argues well. Had the jury returned a verdict in favor of the defendant, it is perhaps unlikely that a contention the verdict was against the weight of the evidence could have prevailed. The issue in this case was strictly one of fact, based on credibility of witnesses, which the jury resolved against the defendant. Credibility is a matter of substance with a tangibility as calculable in weight as iron. The scales for measuring it, however, are in the jury room and not in the consultation chambers of appellate courts. Thus, since the jury disbelieved the defendant's witnesses where they refuted testimony presented by plaintiffs' witnesses, the factual issue is settled; and, if no legal question intervenes to nullify what the jury has done, the litigation is ended.

But the defendant would want us to believe that there was no acceptable evidence of an explosion. The record puts such a contention to rout. Bert Mohney testified: "Q. You have often heard dynamite blasts in the past? A. Yes, sir. Q. And do these blasts sound like dynamite? A. Well, the last one did. Q. Like an explosion? A. Like an explosion. It was really loud. ... Q. Was it a very loud noise? A. Yes, sir; it was loud. Q. And was there much shaking of the Club House? A. Well, you could hear the windows rattle pretty good that night."

Robert G. Nolte testified: "Then this one big one that occurred on the particular night was about 10:20 in the evening of that night, and we got the shaking, the tremor, and the blast was so terrific that I thought my house had blown up; and the children were sleeping in bed; they woke up screaming, jumped out of bed, and ran out of the house. I ran to the cellar; I thought my furnace had blown up."

Mrs. Shirley Heward testified: ". . . on the night in question, November sixteenth, we had a guest in from New York, and we were just sitting down to watch the fights, and they had just started, we heard this tremendous blast and explosion. The first thing I said was, 'My goodness, the furnace has blown up', and my husband and the other gentleman dashed to the basement, and I ran to the children, and the phone started to ring, and we were all on the telephone together, all the neighbors, we are all on the same line, and my husband eventually ran outside, and naturally if it wasn't our furnace we were concerned as to whether it was someone else's."

Carl R. Ritzman testified: ". . . this tremendous sound came; we have accepted it as an explosion; and there was a definite, big, over-quick type thing; and we just were petrified; and we were in the basement, which is frightening, I think, when there is a big vibration.

and we just waited to hear panes of glass fall out of those big windows, in particular."

William F. Ashe testified: "A. Well, I heard this big explosion like. It woke me up, and I jumped out of bed right away, and my brother was sleeping in another room, and he came over to my bedroom, and I couldn't figure out what happened. . . . it woke up their kids; almost knocked them out of bed; and when this happened it just, it shook the whole house. It even shook the bed that I was in."

Then the appellant urged that the testimony of the plaintiffs' witnesses cannot be accepted because it is opposed to the incontrovertible physical facts which, according to the defendant, are: "1. The mine remained undamaged after an explosive charge was allegedly fired sufficient to penetrate 300 feet of overburden. 2. The miners who were, according to the plaintiffs, conducting retreat operations in the area of this alleged explosion and who supposedly fired the charge, remained unaffected by the force of the blast." With regard to Point 1, it is not uncontroverted that the mine remained "unchanged" after the explosion. The defendant says that because the mine worked the day following the accident, there could not have been any explosion. This is no proof at all. The spot of explosion was obviously a circumscribed one and the defendant produced no evidence that the mine was undamaged immediately below the Shearer home.

Nor was there evidence, under Point 2, that "the miners who supposedly fired the charge, remained unaffected by the force of the blast." Five miners testified. Not one could say where he was when the accident occurred. Miner Edward K. Morris testified: "Q. Approximately where were you working at about 10:00 to 11:00 o'clock? A. Well, I just can't tell exactly, right at that time." Carlo Bellotti testified he

was with Morris who, as we have seen, did not know where he was. Andrew Bordick testified: "Q. And was the cave-in, and I am pointing to the blueprint, was the cave-in in the panel where the Ashe house is above it or the Shearer house is above it, or do you know? A. I do not know."

Then, there is Roy Shaffer who was not even in the mine the night of November 16th. And George Bellotti, the remaining miner-witness, testified he was in the lamphouse at the time of the explosion and therefore obviously not in the workings.

But, aside from all this, the defendant cannot interpose the incontrovertible physical facts rule because "No fact based on *oral* testimony in a trial ever possesses the character of legal incontrovertibility until it receives the imprimatur of a jury's acceptance."[*] The jury here placed no imprimatur on what the defendant contends for.

The defendant maintains that the damage to the plaintiffs' house was caused by subsidence and not by explosion, but this is a matter of argumentation. The fact that the appellant's expert witness testified that it would take 300 pounds of dynamite to set off a blast capable of causing the admitted damage to the plaintiffs' dwelling does not place on the plaintiff, as the defendant urges, any burden to refute the accuracy of the statement. The jury may not have believed the defendant's expert or it may have believed that the mining company did, in fact, use that quantity of dynamite.

Nor can it be contended, as the appellant does, that its liability is not clear. It insured against explosion and the record clearly establishes the factuality of an explosion. The insurance company could not have been unaware that in deep pit coal mining, explosives are

---

[*] *Fisher v. Hill*, 362 Pa. 286, 291.

used. It voluntarily undertook a risk spelled out in the policy and it may not now complain because the peril insured against crystallized into fact. An insurance company which insures against rain in Bombay during the summer months cannot complain if its treasury is liquidated by a flood of claims in July.

Only two more matters need be considered. The appellant argues that because the two experts called by the plaintiffs did not agree in all particulars, their testimony must be ignored completely, and that, this being done, the plaintiffs would have no expert evidence to support their charge of negligence against the defendant. To support this contention the defendant cites the case of *Mudano v. Phila. Rapid Transit Co.*, 289 Pa. 51, but that case does not apply to the facts here. Although the plaintiffs' experts in this case differed somewhat in their opinions, it cannot be said that their conclusions absolutely contradicted one another.

The appellant finds contradictions between the Judge's charge and his affirmance of points. We do not find them, nor do we find any reason in the record for granting a new trial or judgment n.o.v.

Judgment affirmed.

Mr. Justice BELL concurs in the result.

Mr. Justice BENJAMIN R. JONES dissents.