**Paul VLASES**

v.

**MONTGOMERY WARD & COMPANY, Inc., Appellant.**

**No. 16007.**

United States Court of Appeals
Third Circuit.

Argued March 6, 1967.

Decided May 10, 1967.

Randall J. McConnell, Jr., Pittsburgh, Pa. (Raymond F. Sekula, Dickie, Mc-Camey & Chilcote, Pittsburgh, Pa., on the brief), for appellant.

Wray G. Zelt, III, Washington, Pa., (Dail E. Sloan, Brownsville, Pa., on the brief), for appellee.

Before McLAUGHLIN, HASTIE and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

This case revolves around the charge that defendant-appellant, Montgomery Ward, was liable for the breach of implied warranties in the sale of one day old chickens to the plaintiff-appellee, Paul Vlases. The latter came to this country from Greece when he was sixteen and until 1954 his primary occupation was that of a coal miner. He had always raised chickens but because of his job as a miner his flocks were small, ranging from between twenty-five to one hundred chicks. In 1958 plaintiff began the construction of a two story chicken coop large enough to house 4,000 chickens and a smaller side building where he could wash, grade and sell the eggs. Vlases worked alone on the coop, twelve hours a day, fifty-two weeks a year, until its completion in 1961. In November of 1961 plaintiff placed an order at defendant's outlet store in Brownsville, Pennsylvania for the purchase of 2,000 one day old chicks. The chickens selected by the plaintiff from Ward's catalogue were hybrid Leghorns and were noted for their excellent egg production. On December 21, 1961 plaintiff received the 2,200[1] chickens and placed them on the first floor of the coop which had been equipped with new brooders, feeders and within a short time, waterers. As a further hygienic precaution wire and sugar cane were placed on the ground so the chickens would not come in contact with the dirt floor. For the first six months Vlases slept in the coop in order to give the new chicks his undivided attention.

During the first few weeks after delivery the chickens appeared to be in good health but by the third week plaintiff noticed that their feathers were beginning to fall off. This condition was brought to the attention of Mr. Howard Hamilton who represented the Agway Corporation which was supplying the plaintiff with feed on credit. In February of 1962 Mr. Hamilton took five chickens to the Bureau of Animal Industry Diagnostic Laboratory where they were examined by Dr. Daniel P. Ehlers. The examination revealed signs of drug intoxication and hemorrhagic disease involving the weakening of blood vessels. Four chicks were brought to Dr. Ehlers in May of 1962 and were found to be suffering from fatigue. On the 14th of August 1962 Mr. Hamilton brought three chickens to the laboratory where Dr. Ehlers' report noted that two of the chicks were affected with visceral leukosis, one with ocular leukosis, one had bumble foot and one had been picked. Visceral and ocular leukosis are two types of avian leukosis complex or bird cancer which disease infected plaintiff's flock either killing the chicks or causing those remaining to be destroyed.

Plaintiff in this two count suit in assumpsit charged negligence and breach of warranty with jurisdiction resting on the diversity provisions of 28 U.S.C.A. § 1332. After the second day of trial the negligence claim was dropped leaving the breach of warranty as the sole problem for the jury's consideration. A verdict was returned in favor of the plaintiff in the amount of $23,028.77. Montgomery Ward appeals from the resultant judgment.

I

Appellant takes the position that an action for breach of implied warranties will not lie for the sale of one day old chicks where there is no human skill, knowledge or foresight which would enable the producer or supplier to prevent

---

1. As a bonus plaintiff received ten extra chickens per each one hundred ordered.

the occurrence of this disease, to detect its presence or to care for the sickness if it was present. The jury was instructed by the court that recovery on behalf of the plaintiff required a finding that the chickens were afflicted with leukosis at the time defendant made delivery. The expert testimony for both sides indicated that there was no way of determining whether newly hatched chicks have leukosis and that there is no medication available to prevent the disease from occurring.[2] Assuming the chickens were diseased upon their arrival the thrust of appellant's argument questions the sufficiency of the law to support a finding that Ward is liable under Pennsylvania law for the breach of implied warranties.

■ The two implied warranties before us are the implied warranty of merchantability, 12A P.S. § 2–314,[3] and the implied warranty of fitness for a particular purpose, 12A P.S. § 2–315.[4] Both of these are designed to protect the buyer of goods from bearing the burden of loss where merchandise, though not violating a promise expressly guaranteed, does not conform to the normal commercial standards or meeting the buyer's particular purpose, a condition upon which he had the right to rely.

■ Were it to be assumed that the sale of 2,000 chickens infected with avian leukosis transgressed the norm of acceptable goods under both warranties, appellant's position is that the action will not lie in a situation where the seller is unable to discover the defect or cure the damage if it could be ascertained. That theory does not eliminate the consequences imposed by the Code upon the seller of commercially inferior goods. It is without merit.

■ The fact that avian leukosis is nondetectable could be an important issue but only as bearing on the charge of negligence, which is no longer in this suit. The Pennsylvania decision in Vandenberg & Sons, N. V. v. Siter, 204 Pa. Super. 392, 204 A.2d 494 (1964), buttresses our conclusion in upholding the

2. In the brief of appellee it was pointed out that preventive measures can be taken to reduce the incidents of avian leukosis in the hatcheries, such as strict hygienic supervision and insuring that the history of the breeding flock is free of the disease. However, there was no evidence introduced showing that the hatchery which supplied the eggs to Montgomery Ward failed to comply with the accepted health standards and for the purpose of this appeal it will be assumed that all necessary preventive steps were followed.

3. Section 2–314:
"(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as
(a) pass without objection in the trade under the contract description; and
(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and
(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.
(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade. As amended 1959, Oct. 2, P.L. 1023, § 2."

4. Section 2–315:
"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. As amended 1959, Oct. 2, P.L. 1023, § 2."

implied warranties. There latent defects in certain tulip and hyacinth bulbs went undetected in the face of two inspections and the court, though aware that the imperfections could only be uncovered after growth, limited its concern to the question of whether the seller's express provision that notice of any breach be communicated within a certain time, was reasonable. The entire purpose behind the implied warranty sections of the Code is to hold the seller responsible when inferior goods are passed along to the unsuspecting buyer. What the Code requires is not evidence that the defects should or could have been uncovered by the seller but only that the goods upon delivery were not of a merchantable quality or fit for their particular purpose. If those requisite proofs are established the only exculpatory relief afforded by the Code is a showing that the implied warranties were modified or excluded by specific language under Section 2–316.[5] Lack of skill or foresight on the part of the seller in discovering the product's flaw was never meant to bar liability. The gravamen here is not so much with what precautions were taken by the seller but rather with the quality of the goods contracted for by the buyer. Even a provision specifically disclaiming any warrant against avian leukosis would not necessarily call for the defendant's freedom from liability. Section 1–102(3)[6] of the Code's General Provisions states that standards which are manifestly unreasonable may not be disclaimed and prevents the enforcement of unconscionable sales where, as in this instance, the goods exchanged are found to be totally worthless.

## II

Appellant contends that plaintiff failed to meet the burden of proof that the chickens were delivered with avian leukosis and further asserts that the verdict is against the weight of the evidence. The argument advanced is founded on

5. Section 2–316:

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof'.

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719). As amended 1959, Oct. 2, P.L. 1023, § 2."

6. Section 1–102(3):

"(3) The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable;"

the fact that avian leukosis may be contracted in two ways, either inherited through the egg or acquired by reason of an unhealthy environment. Appellant urges that since the disease was first diagnosed when the chickens were nine months of age and since there was evidence indicating the existence of other maladies aside from leukosis, that plaintiff failed to show the presence of avian leukosis at delivery and also that the disease was the cause of the inability of the chicks to produce eggs and of their deaths. Upon consideration of all the trial testimony, appellant's argument must be rejected.

It was firmly established by the evidence that with reference to inherited as opposed to environmental leukosis, incidents of the latter are minimized where proper care and health standards are strictly observed. Testimony revealed that environmental infection will more than likely occur where the chicks are housed in a coop previously occupied by a diseased flock, where leukosis is present in nearby chickens or where the young chicks come in contact with contaminated equipment. On behalf of the plaintiff it was shown that the chicks were placed by him in a newly constructed coop with new equipment. There was no evidence that the disease was then present on the farm or had ever affected other chickens raised by Vlases. Plaintiff's expert witness, Dr. Frank A. Bartus, had examined the chickens six or seven months after the first diagnosis of the disease and testified that at that time "this disease [avian leukosis complex] was just running rampant through the whole flock." In the opinion of Dr. Bartus the leukosis found in plaintiff's chickens was transmitted through the egg. That opinion was based on the witness' expertise and factually supported by the consideration that " * * * he [Vlases] has raised chickens in the past, and the fact that he was a fairly good husbandry man, and the fact that he had a new coop I think are very important features in this case." Bolstering plaintiff's proofs was

the testimony of appellant's expert witness, Dr. Daniel P. Ehlers, who stated that the new equipment could not be contaminated and from whom, as to the origin of the disease, the following was elicited:

"Q. If in a case for example, there was a brand new coop that had never been used before, the feeders and the waterers and all the equipment was brand new, and had never been used by chickens before, where there were no chickens within fifty yards or a hundred yards that had had this leukosis disease, and the chickens were put into this coop and this environment and developed leukosis, would it be your opinion that they probably got it through the egg rather than from environment?

A. I would have to know if the caretaker had been walking from the old contaminated house into the new house.

Q. Assuming there was not an old contaminated house whatsoever, assume even though there was another house, the caretaker never entered that house.

A. If you had that ideal condition, it would be quite obvious that they had come from the eggs."

Pennsylvania law demands that the burden of proof be met with more than conjecture, it requires that the inferences drawn from the facts and circumstances upon which plaintiff relies be established by a preponderance in favor of the basic proposition to the exclusion of any equally well supported belief in any inconsistent theory, Henderson v. National Drug Co., 343 Pa. 601, 23 A.2d 743 (1942); Kirshon v. Friedman, 349 Pa. 171, 36 A.2d 647 (1944); Shearer v. Insurance Co. of North America, 397 Pa. 566, 156 A.2d 182 (1959). But the proofs need not be convincing to the point of absolute certainty, Rasner v. Prudential Ins. Co. of America, 140 Pa.Super. 124, 13 A.2d 118 (1939), and may be sustained though the trier of fact has not been persuaded be-

yond a reasonable doubt, Gima v. Hudson Coal Co., 106 Pa.Super. 288, 161 A. 903 (1932), aff'd 310 Pa. 480, 165 A. 850 (1933); In Re Ferenci's Petition, 217 F.Supp. 714 (1963). Plaintiff's task was to develop facts and circumstances from which the jury could reasonably conclude that the chickens were diseased at the time of delivery. Here substantial support of that decisive element in the claim was furnished by the expert testimony connecting the progressively lower probabilities of avian leukosis infecting flocks under proper care and testimony underlining the sanitary precautions taken by Vlases to insure the flock's health. Other than the diagnosis by Dr. Ehlers, of a few minor diseases prior to his discovery of leukosis, appellant offered no proof in any way disputing plaintiff's evidence of the virus free environment in which the chickens were raised. Under all of the testimony the plaintiff clearly met his required burden of proof and that evidence was adequate to uphold the verdict reached by the jury.

Appellant also alleges that because there was evidence of other diseases, plaintiff failed to prove that leukosis was the sickness that restricted egg production. This is directed both at the burden of proof and the sufficiency of the evidence. The simple answer is first, that the jury could have and did find that the flock was infected with leukosis at delivery which resulted in the premature demise of the chickens and ended egg production from then on. Secondly, the record shows that while the chickens were still alive there was little or no egg production and the small number that were laid were brown in color when they should have been white. The evidence linking leukosis with the failure of egg production was strongly set forth in the following testimony of Dr. Ehlers:

"Q. Doctor, if a flock develops leukosis, is there any cure for it?

A. No.

Q. And what kind of an egg production do they have after they develop leukosis?

A. Zero."

III

Appellant next urges that the District Court erred in charging the jury regarding implied warranties. This concerns the instruction, that if the jury concludes that the chickens had leukosis when delivered to the plaintiff that body should find for the plaintiff and proceed to the question of damages. Error is asserted on the ground that it constitutes a charge of absolute liability. The opinion in Adams v. Scheib, 408 Pa. 452, 184 A.2d 700 (1962), is relied on by appellant to demonstrate the danger of such an instruction when dealing with implied warranties. Adams dealt with the liability of the seller of pork to customers who became ill of trichinosis. The instruction in Adams, that if the jury found that the defendant sold pork sausage to the plaintiffs and the meat was unwholesome defendant would be liable regardless of his knowledge of the pork's condition, was misleading since it failed to include the relevant matter of how the meat was prepared which might bar recovery despite the jury finding in accordance with the court's instructions. It follows that the Adams ruling is not germane to this appeal where the jury's deliberation centered solely on the evaluation of facts pertaining to the problem of whether the chickens were diseased when delivered and on answering that affirmatively the absence of preventive measures available to the plaintiff made further findings unnecessary.

Again with respect to the charge, appellant complains of the court's failure to tell the jury that the implied warranty of fitness is based upon reasonableness. Just where and how this reasonableness test should have been charged is not suggested, but it is enough to state that the statute itself makes no mention of such a standard.

Lastly, appellant attacks the qualifications of the plaintiff to testify as an expert regarding the amount of feed it took per year to care for a chicken, egg production per year and his estimation of the life of the chicken coop.

From the record, plaintiff had raised chickens and handled coops, including the one before us, most of his life down to trial time. The acceptance of plaintiff as an expert in those particulars was within the sound discretion of the district judge.

The judgment of the District Court will be affirmed.