**Frederick T. HARRIGAN**

v.

**UNITED STATES of America.**

**Civ. A. No. 72–1535.**

United States District Court,
E. D. Pennsylvania.

Jan. 20, 1976.

Jerome H. Ellis, Philadelphia, Pa., for plaintiff.

Neil R. Peterson, Asst. Chief, Torts Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., John J. Farley, III, Trial Counsel, Torts Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for the United States.

## OPINION

CLARY, Senior District Judge.

The above captioned case tried to the Court without a jury between the dates of November 12, 1975, and December 5, 1975, and the testimony having been completed on the part of the plaintiff and the government and the case submitted to the Court for determination, now upon all the pleadings, exhibits and proof adduced in this case, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff is Frederick T. Harrigan, who resides at 3125 North 30th Street, Philadelphia, Pennsylvania.

2. On August 28, 1966, plaintiff broke his neck in a diving accident, suffered a fracture dislocation of his spinal cord at the C–4–5 level, and was rendered quadriplegic.

3. Plaintiff was hospitalized at Shore Memorial Hospital, Somers Point, New Jersey and then transferred on September 19, 1966, to the Veterans Administration Hospital, Philadelphia, Pennsylvania.

4. A cervical fusion was performed on January 24, 1967, but no claim is made as to that operation.

5. On June 2, 1967, resident urologists performed a bilateral ureteroileostomy, which is a urinary diversion effected by cutting the ureters at the point they enter the bladder, connecting them to the ileum (a section of the small intestine), and passing the ileum out through an opening in the skin of the lower abdomen. The opening is called a stoma, and an external collection device is cemented to the stoma to collect the urine passing out through the ileum.

6. The operation was technically successful, and plaintiff makes no claim of negligence in the performance of the surgical procedures.

7. On August 3, 1972, plaintiff brought suit against the United States of America under the Federal Tort Claims Act, 28 U.S.C., Section 1346(b), claiming that the VA Hospital residents performed the ileostomy without his informed consent and that they were negligent in failing to follow alternative and more conservative methods of treatment and in not transferring plaintiff to a spinal cord injury center.

8. An administrative claim was filed with the Veterans Administration on November 30, 1972, and was denied on June 6, 1973. An amended complaint was filed on January 6, 1973.

9. The operating surgeon for plaintiff's bilateral ureteroileostomy on June 2, 1967, was Dr. Hugo Mori, Chief Resident of the Urology Service and a senior resident in urology. He was assisted by Dr. Terrence Malloy, a third year resident, by Dr. Norman Lasky, a second year resident, and Dr. Jerry Gotlieb, a first year resident.

10. From November 4, 1966, to June 2, 1967, plaintiff was under the care of the Physical Medicine and Rehabilitation Service and was treated primarily by Dr. Dorthea Glass and Dr. David A. Tull. Dr. Glass was the Chief Resident of the PM&R Service, and Dr. Tull was a third year resident.

11. When plaintiff arrived at the Philadelphia VA Hospital, he had a functioning tracheostomy, decubitus ulcers, an indwelling Foley catheter, and an elevated temperature caused by urinary tract infection.

12. The doctors were unanimous in stating that the goal of urological treatment in the plaintiff's case should be removal of the indwelling catheter which causes infection.

13. Dr. Dorthea Glass requested a genito-urinary consultation, and Dr. Mori was consulted on November 16, 1966. He recommended a cystometrogram which is used to determine what the capacity of the plaintiff's bladder was, how well it emptied, and whether reflex contractions were present. Dr. Mori found from the cystometrogram that plaintiff had a spastic reflex bladder, which is a bladder that contracts and expels urine without voluntary control from the brain, but through motor reaction of the spinal cord.

14. Dr. Mori noted on November 16, 1966, that if reflex contractions were found to be present in the cystometrogram, he planned to start clamping the Foley catheter for 1½ hours at a time for 1–2 weeks and then give a trial of voiding.

15. The cystometrogram did not reveal reflex contractions, and plaintiff failed to achieve a normal voiding spike, i. e., he could not void voluntarily and completely.

16. A trial of voiding was never tried, but Dr. Tull indicated that the Foley catheter was clamped on one occasion and plaintiff developed a temperature spike, indicating fever and urinary infec-

tion. No further attempts were made to clamp the Foley catheter.

17. Doctors Terrence R. Malloy and John J. Murphy, expert urologists, testified that the cystometrogram showed plaintiff had an autonomic neurogenic bladder. A neurogenic bladder is one not having normal nerve control because of disruption either in supply or exit of nerves to the bladder. Since damage to the plaintiff's spinal cord prevented nerve signals from reaching the brain, the muscles of the bladder would not work synchronously, and the bladder would not empty completely or at all. Autonomic means contractions of the bladder occurred without plaintiff's control.

18. A neurogenic bladder is dangerous, because failure of the bladder to empty allows infected urine to collect and spread infection to the ureters and kidneys. Doctors Malloy and Murphy stated that infection can spread to the kidneys from the bladder through the ureters, the lymphatics, or the blood stream.

19. Reflux is the condition where urine backs up in the bladder and flows back up the ureters. Reflux is likely to lead to infection in the ureters and kidneys. On December 14, 1966, Dr. Mori recommended a cystourethrogram to determine if the plaintiff was refluxing. Ultimately, no reflux was found.

20. The hospital temperature charts indicate that plaintiff had elevated temperatures of 99.6° to 103° during most of the months of January and February and into the first half of April 1967. The elevated temperatures indicated a fever due to urinary infection. Urine cultures taken during this period also indicated infection. Febrile condition with positive urine cultures are symptoms of a condition called sepsis.

21. A blood test, called a BUN, for amounts of blood, urea, and nitrogen in the blood also indicated that plaintiff had infection.

22. An IVP (Intravenous Pyleogram) which is a test of the functioning of the kidneys was normal.

23. Dr. Tull, who was the primary treating physician in PM&R, requested Dr. Mori to evaluate the plaintiff for a urinary diversion operation on March 28, 1967. Dr. Mori recommended a diversion on March 31, 1967, because of the repeated episodes of sepsis, characterized by fever and chills, repeated urinary tract infections, urine cultures showing infection, and the patient's critical course.

24. The bilateral ureteroileostomy was elective surgery which means that time was not of the essence. The operation was performed to prevent kidney damage and to preserve the renal functions, but Dr. Mori could not explain why it was done on the particular date of June 2, 1967.

25. Dr. Mori's residency ended July 1, 1967.

26. Dr. Abramson, professor at Albert Einstein College of Medicine in New York and an expert in both Physical Medicine and Rehabilitation and in Spinal Cord Injury cases, stated that indications for a bilateral ureteroileostomy are reflux and deterioration of the kidneys accompanied by infections. In Dr. Abramson's opinion, the operation was not indicated in plaintiff's case, because plaintiff had a normal urinary tract, showed good contraction of his bladder, secreted urine, and was able to void despite an obstruction. Dr Abramson stated that the operation was a controversial procedure in 1967 and should only have been used at a later stage of decay in the plaintiff's urinary tract. Since the operation was irreversible, according to Dr. Abramson, less serious and more conservative forms of treatment should have been tried first.

27. Dr. Abramson testified that the proper mode of treatment for plaintiff was removal of the indwelling catheter and training of the bladder together with administration of antibiotics to control infection. In Dr. Abramson's opinion, a trial of voiding also should have been attempted: trial of voiding is a periodic clamping and unclamping of the indwelling catheter to build up bladder

capacity then having the patient void at timed intervals.

28. An alternative form of treatment to the ileostomy was a procedure called intermittent catheterization (I/C). I/C involves insertion of a catheter into the bladder at time intervals in order to establish regular, periodic voiding. After I/C has been followed a Texas catheter, which is comparable to a condom with a drainage tube, is fitted over the end of the penis. Dr. Abramson testified that I/C was not a widely adopted procedure in 1967 and was not the traditional approach.

29. Dr. Tull, who was plaintiff's primary treating physician and now a VA Hospital staff physiatrist, testified that plaintiff needed to become free of his catheter and, based on the entire course of treatment, needed the ileostomy operation.

30. Drs. Malloy and Murphy, specialists in urology, testified that in their opinion plaintiff received medical care conforming to the accepted standards in Philadelphia. They testified that the bilateral ureteroileostomy was the proper and conservative mode of treatment for the plaintiff's neurogenic bladder. Conservative treatment would aim at preserving the kidneys. Plaintiff's fever and infections indicated to the doctors that the kidneys were in danger of infection, and that an ileostomy would help to lessen infection and protect the renal functions.

31. Drs. Malloy and Murphy both testified that Dr. Abramson had misinterpreted the cystometrogram when he stated that plaintiff had bladder contractions and was capable of voiding. They were of the opinion that the test showed no normal voiding spike.

32. Drs. Malloy and Murphy stated that if the plaintiff showed signs of reflux and deterioration of the kidneys, then it was too late for the operation because kidney damage had already been done. The fever and urinary infections evidenced by cultures were sufficient indications for the ileostomy in dealing with plaintiff's neurogenic bladder.

33. Dr. Malloy testified that the following methods of treatment were considered and rejected in plaintiff's case:

a) Texas catheter—was rejected because sphincter muscle was spastic and bladder was infected and not emptying. The elastic band of the Texas catheter could cause gangrene of the penis.

b) Cutting sphincter (transuretheral resection)—was rejected as not appropriate for this neurogenic bladder and would not end bladder infection.

c) Intermittent catheterization—was rejected because continuous or straight drainage with Foley catheter was resulting in fever and infection and I/C would cause more urine to be retained in bladder.

d) Cystostemy—was rejected because it required leaving an indwelling catheter which created a likelihood of infection.

34. Dr. Murphy testified that alternative treatment was not preferable to an ileostomy for the following reasons:

a) Intermittent catheterization—This procedure was not widely accepted in Philadelphia area in 1967. It required introduction of a catheter into the body 3 or 4 times a day, so that damage to the urethera was possible.

b) Transuretheral Resection—This operation was applicable mainly to patients with lower spinal cord injuries and not to plaintiff who had upper spinal cord injury.

c) Vesicostomy—This operation is similar to an ileostomy, and the latter is more successful.

d) Crede—This procedure is placing pressure on the bladder by pressing on the belly with one's hands. Plaintiff was unable to do it, and it would be dangerous for another person to do it.

e) Trial of Voiding—Cystometrogram indicated this approach would fail, because the patient could not void spontaneously. There is also some

risk in a trial of voiding in that it causes infected urine to back up.

35. In 1967, two schools of thought were prominent in urology as to treatment of plaintiff's condition. One school represented by Drs. Bors and Comaar of Long Beach, California and the Bronx VA Hospital advocated intermittent catheterization and no surgery—surgery was a last resort. Another school of thought represented by the Mayo Clinic, Ruben,* Minnesota, advocated the diversionary surgery. Dr. Tull testified that the Philadelphia VA Hospital had no fixed policy as to the two schools. Drs. Mori, Malloy, and Murphy stated that the Philadelphia area hospitals preferred the diversionary surgery.

36. Dr. Abramson testified that an ileostomy was dangerous in that it created an opening to the outside air through which bacteria and infection could spread. Drs. Malloy and Murphy were of the opinion that the open system was of minimal danger, no greater than for any other opening in the body.

37. Dr. Abramson's medical opinion was that plaintiff should have been transferred to a Spinal Cord Injury Center, such as the Bronx VA Hospital in New York, and failure to do so was not accepted medical practice.

38. Dr. Murphy stated that plaintiff did not have to be transferred to a Spinal Cord Injury Center to receive adequate care and that the medical care would have been the same at such centers in Philadelphia.

39. In the Chief Medical Director's Letter No. 68–24 of April 24, 1968, the Veteran's Administration established a policy of transferring spinal cord injury patients to specialized VA Spinal Cord Injury Centers as soon as possible.

40. A VA Field Station Summary for June 30, 1967, showed that all VA Hospitals had 993 designated operating beds for spinal cord injury and disease patients. There were 1,981 spinal cord injury and disease patients at the same time.

41. Drs. Tull, Malloy and Murphy testified that residents frequently performed an operation such as an ileostomy, if they had done the operation before with a staff, attending physician. Plans for operations were approved by the staff at weekly meetings and could not be done without approval. Dr. Mori had previously performed 10 ileostomies.

42. Plaintiff's mother, Charlie Mae Harrigan, signed the consent form for the bilateral ureteroileostomy with the plaintiff's oral authorization.

43. Plaintiff testified that he was told by doctors at the Philadelphia VA Hospital that the bilateral ureteroileostomy would eliminate kidney stones and infections, which he was likely to have with the Foley catheter, and that the operation was reversible in the event he was able to walk again. He was also told that he would not live as long without the operation.

44. Plaintiff's mother testified that the plaintiff did not want the operation, and she changed his mind because of the statements of Dr. Tull to the effect that the plaintiff would have stones and infections unless he had the operation. Plaintiff's mother remembered Dr. Tull drawing a diagram of the operation, but she did not understand it. She did not recall being told about alternative treatments or other hospitals, nor about the problem of leakage of urine. She testified that Dr. Tull obtained the consent form.

45. Dr. Tull testified that he did not obtain plaintiff's consent for the operation, rather such responsibility belonged to the urology doctor performing the surgery. Dr. Tull recalled discussing the operation with the plaintiff, because the doctor was his friend and confidante. Dr. Tull stated that he did not give the plaintiff full details of the operation, that he recommended the operation to plaintiff, and that he told plaintiff

---

* It is not clear from the deposition whether this is the name of a doctor or a misspelling of the name of the town of Rochester.

"some people" do not believe the operation should be given. According to Dr. Tull, the plaintiff would mentally shut him out on occasions when he tried to explain the operation, and the doctor had "to seize a teachable moment."

46. Dr. Tull told the plaintiff that there would be no leakage at the site where the collection bag was placed over the stoma.

47. Dr. Mori testified that it was his responsibility to obtain the informed consent of the plaintiff. While Dr. Mori is certain that it was done, he does not recall informing the plaintiff or obtaining the consent. According to Dr. Mori, he did not tell the plaintiff that the operation would eliminate stones or infections, rather it would lessen the likelihood of their occurring.

48. Dr. Malloy testified that he, Dr. Mori, and other doctors answered questions for plaintiff at a meeting in which Dr. Mori described the operation. According to Dr. Malloy, Dr. Mori told the plaintiff of the high mortality rate due to urinary disease among World War II and Korean War quadriplegics. The plaintiff was told that the operation was his best chance of avoiding infection in his kidneys, but he was not told that all infection would be prevented. Dr. Malloy also stated that Dr. Mori told plaintiff that there might be problems of leakage during the first period after the operation until the stitches settled. In Dr. Malloy's opinion, the plaintiff understood the operation and knew of its potential complications.

49. According to Dr. Tull, plaintiff was told about the use of a Texas catheter but in non-technological terms. He did not explain intermittent catheterization to plaintiff, nor does Dr. Malloy recall explaining the procedure or the Bors-Comaar approach.

50. Drs. Mori, Malloy, and Tull did not recall telling plaintiff that the operation was reversible. Drs. Malloy and Murphy stated that the bilateral ureteroileostomy was reversible, and Dr. Murphy stated that he personally had reversed one such operation. Medical literature showed other ileostomies had been reversed successfully.

51. The United States admitted that the plaintiff was not told that urine would leak from the collection bag or from between the bag and the stoma, nor that leakage might aggravate plaintiff's decubitus ulcers. Leakage was not considered an important risk of the operation, and the United States asserts that proper care should prevent urine from aggravating plaintiff's ulcers.

52. Plaintiff testified that leakage of urine occurred after the cement holding the collection bag to the stoma loosened. Plaintiff could smell the odor of urine and feel it in his clothes. The cement would generally loosen after approximately 3 or 4 days, and urine would then begin to seep out. Leakage would occur sooner with more movement and exercise, so that his movement and travel was inhibited. The collection kit would have to be changed when leakage occurred.

53. Dr. Amanda C. Blount, an osteopathic physician, testified that leakage of urine from plaintiff's collection bag was contributing to maceration of tissue, and, therefore, aggravating plaintiff's decubitus ulcers. Decubitus ulcers are a breaking down of skin at pressure points over joints. Dr. Blount estimated that 25% of plaintiff's ulceration was caused by urine leakage. Dr. Blount stated also that there were areas of irritation around the stoma where the cement had been applied to hold the collection bag and beneath the belt holding the collection device in place.

54. Dr. Blount testified that the plaintiff never complained of leakage of urine, any Mary McLauglin, R.N., nurse at the Philadelphia VA out-patient clinic who treats plaintiff, also stated that she had no complaints from plaintiff of urine leakage. Plaintiff has called Mary McLaughlin with other complaints.

55. Bruce E. Wetzel, head nurse in the Philadelphia VA Hospital Urology Dept., testified that he placed the collection device on plaintiff. He has never received any complaint from plaintiff

and he stated that if there was leakage, different devices could be tried to stop it. He stated that leakage is not normal and can generally be stopped. According to Wetzel, there are stomal therapists who can instruct the plaintiff in use of the collection bag and care of himself.

56. Dr. Blount testified that plaintiff has complained of impotence and that he found the external collection device a deterrent to sexual relations. According to Dr. Blount, the plaintiff became depressed because of the bag and found it objectionable.

57. Plaintiff testified that he was able to have sexual relations after the ileostomy operation and that he has done so on several occasions. He stated that he had a woman living with him at his home for several months in 1972.

58. Dr. Robert Sadoff, a psychiatrist, testified that plaintiff told him that urine leakage caused the plaintiff embarrassment with women and detracted from sexual relations. The plaintiff told Dr. Sadoff that he had been able to have sexual relations before the operation while a quadriplegic. According to Dr. Sadoff, however, the plaintiff may have been bragging as to these sexual relations and may have been merely saving face. Dr. Sadoff stated that the plaintiff feels a need to hold out that he can have sex in order to feel that he is still a man.

59. Dr. Tull testified that the plaintiff needed to prove his manhood through sex. According to Dr. Tull, the plaintiff wanted to get the Foley catheter out so that he could use his penis to have sex. Prior to the operation, the plaintiff told Dr. Tull that he had been unable to have sexual intercourse and that his girl friend had left as a result. In Dr. Tull's opinion, the plaintiff could not have sexual relationships after he broke his neck, but he could have an erection over which he had no control.

60. Dr. Tull testified that the plaintiff's observation of another patient who had the ileostomy operation was a big influence on the plaintiff to have the operation. The other patient was in a comparable medical situation to the plaintiff's, and after the diversionary operation, the patient was discharged from the hospital and soon married. According to Dr. Tull, the plaintiff saw these results, wanted to leave the hospital and hoped to get married, too.

61. Dr. Tull expressed the opinion that the plaintiff presently felt a psychological insult, because he had discovered during his hospitalization at Castle Point VA Hospital in New York that other patients with the same level spinal cord lesion did not have the diversion and could urinate through the penis.

62. Dr. Sadoff stated that plaintiff was angry about the operation, because he had been informed at Castle Point in 1972 by a patient and a doctor that it was unnecessary and not reversible. Dr. Sadoff believed that the plaintiff's discovery that he had been limited anew in his physical powers by this alleged unnecessary operation was having adverse emotional impact on him and upsetting his previous positive adjustment to quadriplegia.

63. Plaintiff expressed fears that the operation, particularly the collection device and leakage of urine, would hurt his chances of becoming a radio announcer. Plaintiff has been taking a correspondence course to become a disc jockey. Dr. Sadoff confirmed that plaintiff had expressed these doubts.

64. Since the bilateral ureteroileostomy on June 2, 1967, plaintiff has been hospitalized for the following problems and operations;

a) Intestinal obstruction requiring laparotomy on June 5, 1970.

b) Tracheostomy on June 8, 1970.

c) Pyelolithotomy and nephrostomy on August 3, 1972, for urinary infection and kidney stone.

d) Bladder stone with pyocystitis in July 1973.

e) Bladder infection in June 1975.

65. Dr. Abramson testified that plaintiff's kidney stone and urinary infections were probably due to the bilateral uret-

eroileostomy, because the operation created an opening to the air allowing bacteria to enter plaintiff's urinary tract.

66. Dr. Malloy stated that small bowel obstruction, kidney stones, and urinary infections are possible post-operative complications of an ileostomy. Drs. Malloy and Murphy were of the opinion that the kidney stone could have been present prior to the ileostomy.

## DISCUSSION

While the defendant has raised several technical objections to the court's jurisdiction over this case, these objections will not be considered, because the case has been tried exhaustively, and a decision can be made on the merits. Essentially, decision requires treatment of two main issues: 1) whether VAH doctors were negligent in their treatment of plaintiff—either because they failed to try alternative methods of treatment or because they did not transfer plaintiff to a Spinal Cord Injury Center and 2) whether the operation was performed without plaintiff's informed consent.

## I. NEGLIGENCE

██ The Pennsylvania law of negligence governs this suit brought under the Federal Tort Claims Act, 28 U.S.C., Section 1346(b). *See Ciccarone v. United States*, 350 F.Supp. 554 (E.D.Pa.1972), aff'd, 486 F.2d 253 (3rd Cir. 1973) and *Christopher v. United States*, 237 F.Supp. 787 (E.D.Pa.1965). The standard of care required of a physician in Pennsylvania was stated in *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959):

A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physician or surgeon is not bound to employ any particular mode of treat-

ment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods [citations omitted].

397 Pa. at 554, 156 A.2d at 838.

These principles of law applicable to physicians were also followed in the cases of *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971) and *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963). For physicians who are specialists, however, the Pennsylvania standard was stated by the Third Circuit in *McPhee v. Reichel*, 461 F.2d 947 (3rd Cir. 1972):

[A specialist] acting within his specialty owes to his patient a higher standard of skill, learning and care than a general practitioner. He is expected to exercise that degree of skill, learning, and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of [those particular] diseases. Due regard must of course be shown to the advanced state of the profession at the time of the diagnosis or treatment.

461 F.2d at 951.

This latter standard appears applicable to the case at hand, because the operating surgeon was a resident urologist acting within his speciality of urology. The rule that a specialist is held to a higher standard requires of him more learning and more skill, but it does not change one of the basic tenets of *Donaldson v. Maffucci, supra*, that where more than one mode of treatment is recognized as proper, the surgeon is not negligent in adopting any of such modes. More is required of a specialist, but his best judgment is the most that can be expected.

### A. Alternative Treatments

Plaintiff, by the expert testimony of Dr. Abramson, a specialist in Physical Medicine and Rehabilitation and in Spinal Cord Injury Cases, showed that in 1967 the advanced state of the profession

of spinal cord injury treatment was that a trial of voiding or intermittent catheterization should have been followed before a diversionary operation was performed on the plaintiff. Dr. Abramson, however, admitted that there was controversy among experts in the profession as to whether the diversionary operation was the preferred course of treatment.

The defendant's experts, specialists in urology, testified that in 1967 there were two schools of thought in urology as to the proper mode of treatment of plaintiff. One school, recommending a trial of voiding or intermittent catheterization, was advocated by Drs. Bors and Comaar of Long Beach, California. Another school, recommending the diversionary operation, was headed by the Mayo Clinic of Ruben, Minnesota. Apparently, Philadelphia urologists followed the latter school of thought.

Pennsylvania law requires that in treatment of a patient a physician employ the skill and knowledge usually possessed by physicians in the same or a similar locality. *Donaldson v. Maffucci, supra.* Plaintiff, however, has argued that a national standard should be applied in this case rather than a local standard, because specialists should be held to a higher standard of care under *McPhee v. Reichel, supra.* Regardless of the merits of plaintiff's legal arguments, the testimony at trial showed that the treatment given plaintiff was accepted in areas other than Philadelphia. Even assuming that inquiry is not limited to Philadelphia standards and procedures, the diversionary operation was considered proper in other cities and by respectable authorities. The advanced state of the profession of medicine was that urologists recognized two schools of thought as to urological treatment of quadriplegics in plaintiff's circumstances. The Philadelphia VA doctors were confronted by a choice between two modes of treatment, both of which were known to them and sanctioned by the urology profession. Their choice was not simply a local one but represented the advanced thought of the profession as a whole at

that time. The choice to perform a diversionary operation can withstand the test of a national urological standard, because the operation was one of two proper modes of treatment.

In Pennsylvania, if a doctor follows one of two lines of thought or belief supported by reputable, respectable, and reasonable medical experts, then he cannot be found negligent. *Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965). Where doctors in good standing in the community disagree or where medical authorities are divided, the competent physician is only bound to exercise his best judgment in determining which course is on the whole best. *Remley v. Plummer,* 79 Pa.Super. 117 (1922), *McHugh v. Audet,* 72 F.Supp. 394 (M.D. Pa.1947). The VA doctors followed a school of thought supported by reputable and reasonable medical authority and exercised their best judgment in deciding upon that course of treatment. Their best judgment was that the diversionary operation was needed. In such circumstances, they cannot be found negligent for choosing and pursuing one school of thought rather than another.

Plaintiff has contended that a trial of voiding should have been tried before the diversionary operation, because the former was more conservative treatment and the operation could always be performed later. Defendant's experts testified, however, that the diversionary operation was recommended because of plaintiff's urinary infections, his critical course, and his general milieu. The VA doctors and defendant's experts were of the opinion that a trial of voiding would have been dangerous for plaintiff and that the diversionary operation was the more conservative treatment. The mode of treatment selected for plaintiff was, in the VA doctors' judgment, the choice most likely to preserve the plaintiff's kidneys and the plaintiff's life. The VA doctors cannot be held liable where they have employed proper skill and given due regard to the advanced state of the profession in making their best judgment for the plaintiff's treatment. In-

deed, the evidence demonstrated that the judgment may well be correct even today.

One further note should be added to the discussion with regard to evaluation of the expert testimony. Plaintiff's expert, Dr. Abramson, was trained primarily in Physical Medicine and Rehabilitation, whereas defendant's experts were mainly urologists. The defendant's experts were able to reveal certain areas of Dr. Abramson's testimony which were inaccurate from a urologist's standpoint. Since the physicians who operated on plaintiff were urologists, the testimony of expert urologists should be given greater weight in evaluating the treatment accorded plaintiff. The fact that expert urologists testified that the plaintiff was given excellent medical care must tip the balance in favor of the defendant apart from any imbroglios over two schools of thought or local standards of care.

Plaintiff has raised several other alternative courses of treatment which the VA doctors could have followed. The evidence at trial indicated, however, that these alternatives were not appropriate nor recommended in plaintiff's case. Having exercised their best judgment in selecting a reasonable mode of treatment, the VA doctors cannot be held liable for not employing each of the other alternatives.

### B. *Spinal Cord Injury Centers*

Dr. Abramson testified that plaintiff would have received better treatment at a Spinal Cord Injury Center than at Philadelphia VA Hospital. Plaintiff also points to directives of April 24, 1968, from the Chief Medical Director of the VA to the effect that spinal cord injury patients should be transferred to Spinal Cord Injury Centers. Dr. Murphy, however, testified that plaintiff would not have received any different treatment in a Philadelphia Spinal Cord Injury Center in 1967 than at the Philadelphia VA Hospital.

Since the directives of the Chief Medical Director were not promulgated in 1967 at the time the plaintiff had his operation, the VA doctors can only be found negligent in this action for lack of prescience. Apparently, plaintiff received the best care that Philadelphia hospitals and doctors could provide in 1967, so the only basis for finding negligence is the fact of a new and different policy requiring transferral. But since plaintiff received adequate and proper care at the Philadelphia VA Hospital by 1967 standards, he cannot be heard to complain, now. The VA doctors cannot be held negligent for failing to send plaintiff to a Spinal Cord Injury Center in 1967, because first, there was no policy requiring transferral, and second, the plaintiff would have received the same treatment at such center in Philadelphia anyway. Plaintiff was content with his medical care for nearly five years before bringing suit, and only subsequent developments seem to have raised his discontent. There was not sufficient proof at trial that the VA doctors had reason to know in June 1967 of policy changes to be made by the VA in April 1968. In such circumstances, the defendant cannot be made to respond in damages.

### II. INFORMED CONSENT

Judge Ditter of this court has ably stated Pennsylvania law on informed consent, as distilled from the leading case of *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966):

(1) where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be told of the alternative possibilities and given a chance to decide what should be done before the doctor proceeds with the operation;

(2) the doctor is under a duty to advise the patient adequately on the dangers to be anticipated as a result of the operation and not to minimize them;

(3) the plaintiff has the burden to prove the operation performed had not been authorized.

*Bowers v. Garfield*, 382 F.Supp. 503, 505 (E.D.Pa.), *aff'd*, 503 F.2d 1398 (3rd Cir. 1974). The latest pronouncement on informed consent was the case of *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647 (1971) (allocatur refused), where the court stated:

A more equitable formulation would be: whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery. The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician.

220 Pa.Super. at 267–68, 286 A.2d at 650.

 While plaintiff did authorize his mother to sign the consent form for the diversionary operation, he asserted at trial that he was not adequately informed or was misinformed as to alternatives, complications, and reversibility of the operation. Since the operation was not emergency surgery, the VA doctors had an obligation under Pennsylvania law to tell the plaintiff of alternative possibilities ascertained by the doctors and to tell him of complications and dangers likely to follow from the operation. The burden of proof, however, is on the plaintiff to show that the consent was not informed and the operation not authorized.

The plaintiff has failed to show that he was misinformed as to the reversibility of the diversionary operation. He was told that it was reversible, and expert urologists testified at trial that indeed the operation could be reversed.

Simply because plaintiff was told by doctors in New York several years after the operation that it was not reversible does not establish his case. Dr. Murphy testified that he personally had reversed an ileostomy. Plaintiff, therefore, was correctly informed on this point.

The United States had admitted that plaintiff was told that there would be no leakage of urine from his collection bag after the operation. Plaintiff, his mother, and his treating physician have testified that there is urine leakage which is causing several problems for plaintiff. The United States presented testimony of VA employees that plaintiff has never complained of urine leakage and that if he did so, measures could be taken to stop the leakage and to solve the problems caused by leakage. The Head Nurse of the VA Hospital Urology Department testified that leakage was not normal and that probably it could be stopped with a properly fitted collection device. This testimony leads to two conclusions: 1) that under the rule of *Cooper v. Roberts, supra*, the problems of leakage may reasonably have not been presented to plaintiff as a significant complication of the operation, because it was not normal and 2) that the VA will be able to stop leakage with a different device thereby eliminating any discrepancy between promise and results. Either conclusion undermines plaintiff's claim that he was misinformed.

 Plaintiff has asserted that he was told that the diversionary operation would eliminate urinary infection and kidney stones. The VA doctors, on the other hand, have stated that they only told the plaintiff that the operation would lessen the incidence or chances of infection and kidney stones. The doctors have stated that urinary infection and kidney stones are complications that can follow any ileostomy, therefore, the probability of their telling the plaintiff that the operation would eliminate all urinary infections and kidney stones is small. The doctors' testimony appears on balance to be inherently more credible on this issue. The plaintiff may

have misunderstood the medical explanation of the effect of the operation or misconstrued their language. The doctors are firm in their testimony that plaintiff was told the operation would lessen the incidence of urinary infection and kidney stones, not eliminate them. That plaintiff has had infection and stones is not proof that he was misinformed on this point. A physician is not liable merely because a course of treatment does not produce desired results; in the absence of a special contract, a doctor is neither a warrantor of a cure nor a guarantor of the result of his treatment. *Incollingo v. Ewing*, 444 Pa. 263, 274, 282 A.2d 206 (1971), *Donaldson v. Maffucci*, 397 Pa. 548, 553, 156 A.2d 835 (1959).

▮ While the law is clear that the VA doctors were required to tell plaintiff about alternative possibilities of treatment, the evidence of whether this obligation was carried out or not is far from clear. Plaintiff, himself, did not testify as to this issue, and the doctors were uncertain or unable to recall specific details of conversations with the plaintiff. Dr. Tull recalled explaining about Texas catheters in non-technological terms, and he remembered mentioning that "some people" did not think the diversionary operation should be performed. Dr. Mori did not recall any of his conversations with plaintiff, and Dr. Malloy believed that he personally did not touch on the matter of alternatives in his discussion with plaintiff but that plaintiff was fully informed as to the operation. In the absence of more definite evidence on this issue, the only conclusion to be drawn is that plaintiff has not sustained his burden of proof on this issue, and the decision must be in favor of the defendant. Any other result would require the court to engage in an impermissible speculation as to what plaintiff was or was not told. The party having the burden of proof must do more than raise doubt in the mind of the fact finder. *O'Neill v. United States*, 157 F.Supp. 193 (E.D.Pa.1957). A plaintiff who has the burden of proof must produce evidence from which the court as finder of the facts can reconstruct the events on which plaintiff bases his right to recover. *Davis v. Moylan*, 354 Pa. 508, 47 A.2d 641 (1946). Pennsylvania law demands that the burden of proof be met with more than conjecture, it requires that the inferences drawn from the facts and circumstances upon which plaintiff relies be established by a preponderance in favor of the proposition to the exclusion of any equally supported belief in any inconsistent theory. *Vlases v. Montgomery Ward & Co.*, 377 F.2d 846 (3rd Cir. 1967). Plaintiff has failed to sustain his burden of proof that he was not told of alternatives to the diversionary operation and under the rule of *Gray v. Grunnagle, supra*, he has failed to establish that there was a lack of informed consent to the operation. Having failed to prove his case by a preponderance of the evidence, plaintiff cannot recover damages.

## CONCLUSION

This is a most unfortunate case. The Court was informed during a colloquy of Court and counsel, that after the original accident plaintiff consulted a New Jersey lawyer whose name appears in the record only as "Gene." The mere happening of the accident as described, a rock in the vicinity of a diving board at a resort, did indeed constitute a possible negligent act on the part of the resort owner. However, the plaintiff was advised that the resort belong to the "mob" and was advised against starting suit against the resort owner. I hasten to add that whatever lawyer was involved it was not plaintiff's present counsel, Jerome Ellis, Esquire, an outstanding member of this Bar who ably represented plaintiff in this action and according to timetable was not consulted until after the applicable New Jersey statute of limitations had expired.

The foregoing discussion (without the benefit of transcript) represents the Court's considered view of the entire testimony, pleadings and exhibits and proof

offered. Dr. Murphy who took part according to his testimony in the Friday discussions of plaintiff's progress at the University Hospital is a world renowned urologist. The Court is completely satisfied from all of the evidence in the case that not only was the operation performed necessary, but was in the highest interest of the patient—plaintiff in this case, and the Court is convinced that the operation undoubtedly saved his life. The alarmingly high incidence of death from renal causes following injuries of the type sustained by the plaintiff following World War II and the Korean War caused urologists to become extremely apprehensive of this type of injury, and the ileostomy here performed according to the proof adduced in this case is as valid today as when it was performed. The Court has considered all of the evidence including the deposition testimony of Joseph Donnelly which adds nothing to any claim supporting plaintiff's case. The Veteran's Administration nor any of its employees were guilty of malpractice and it necessarily must follow that the verdict will be entered in favor of the defendant.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action under the Federal Tort Claims Act, 28 U.S.C., Section 1346(b).

2. The bilateral ureteroileostomy was a proper and adequate mode of treatment for plaintiff's condition, and alternative treatments, including a trial of voiding, Texas catheters and intermittent catheterization, were not indicated.

3. The plaintiff was properly informed that the bilateral ureteroileostomy would lessen the likelihood of urinary tract infection and kidney stones and that his life span would probably be increased because of the removal of the indwelling Foley catheter.

4. The plaintiff was properly advised that the ileostomy operation was reversible.

5. Plaintiff has failed to show by a preponderance of the evidence that he was not adequately informed as to alternative methods of treatment. Plaintiff's doctors disclosed the significant risks and complications of the operation.

6. Plaintiff was not informed as to urine leakage from the collection device, but such leakage is not normal and can be stopped with properly fitted collection devices.

7. The plaintiff received adequate medical care at the Philadelphia VA Hospital, and there was no need to transfer him to a Spinal Cord Injury Center.

8. A reasonable man in plaintiff's situation would have been adequately informed so as to give his voluntary consent and would have undergone the operation in Philadelphia or other similar locality.

9. Plaintiff was properly informed as to the nature of the operation and gave his voluntary consent with adequate knowledge of the consequences.

10. Judgment is to be entered for Defendant.