**Joseph SESSA, Jr.**

v.

**Gene RIEGLE et al.**

**Civ. A. No. 73–1357.**

United States District Court,
E. D. Pennsylvania.

Feb. 22, 1977.

---

William J. F. Bell, Feasterville, Pa., for plaintiff.

William H. R. Casey, Rossi & Casey, Warminster, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

This civil action was instituted by the buyer of a standardbred race horse against the seller, to recover for breach of express warranties, an implied warranty of merchantability and an implied warranty of fitness for particular purpose. Having heard the testimony of witnesses for the plaintiff and for the defendants during a trial before the Court without a jury, and on the basis of the pleadings and exhibits of the parties, the Court enters the following Findings of Fact, Discussion and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Joseph Sessa, Jr. (Sessa) is a citizen of Pennsylvania.

2. Defendants Gene Riegle (Riegle), Mrs. Gene Riegle and Mrs. John A. Frantz are citizens of Ohio.

3. The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs.

4. Sessa is employed as a beer distributor in Philadelphia, and as an avocation owns and races standardbred horses. In connection with his avocation, Sessa has bought, sold, valued, selected and generally dealt in standardbreds at various locations in the Eastern United States.

5. Riegle buys, sells, owns, trains, drives and deals in and with standardbred horses and engages in racing competition at various harness tracks in Ohio, Illinois and other parts of the country.

6. Sessa became interested in purchasing a standardbred race horse named Tarport Conaway owned by defendants, Mrs. Gene Riegle and Mrs. John A. Frantz after hearing about the horse and his record in February and March of 1973 from one Robert J. Maloney. Maloney had seen the horse at Riegle's farm in Greenville, Ohio.

7. At all times herein relevant, Riegle acted for himself and as agent for Mrs. Riegle and Mrs. Frantz in connection with the sale of Tarport Conaway.

8. Based on what Robert J. Maloney had told him, on March 9, 1973, Sessa sent Maloney to Riegle's place of business in Greenville, Ohio as his agent to effect the pur-

chase of Tarport Conaway. Maloney carried Sessa's check for the $25,000. purchase price to be delivered to Riegle if the sale was consummated.

9. Sessa also instructed his son, Richard Sessa, to obtain a veterinarian to go to Ohio to examine the horse. When he failed to do so, Sessa sent Maloney, a personal friend and knowledgeable horseman, to Ohio to complete the sale alone.

10. Sessa was relying chiefly on Maloney's judgment and evaluation in purchasing Tarport Conaway.

11. Maloney arrived in Ohio on Friday, March 9, 1973. On Saturday, March 10, 1973 he examined and jogged Tarport Conaway. His examination was not restricted in any way.

12. Maloney then telephoned Sessa from Riegle's house. He reported that he had jogged Tarport Conaway and "liked him."

13. Maloney then gave the telephone to Riegle who spoke to Sessa. In a short conversation he told Sessa that Sessa would like the horse, that he was a good one and that he was sound. They also discussed arrangements for transportation of the horse and the manner in which he could best be driven. Sessa indicated that he would send a van for transportation. Riegle then gave the phone back to Maloney.

14. After a brief conversation, the telephone call ended.

15. At some point just prior to or after the telephone call, Maloney delivered Sessa's check for the $25,000. purchase price to Riegle.

16. Later in the day, Sessa called Riegle to report that he was unable to obtain a van to ship the horse.

17. Riegle agreed to obtain a van on Sessa's behalf.

18. Tarport Conaway remained in Riegle's custody until March 23, 1973. During this interval he received proper care.

19. On March 23, 1973, Riegle placed the horse in the hands of an ICC approved carrier for shipment to plaintiff at Freehold Raceway in Freehold New Jersey.

20. At 4:30 A.M., on March 24, 1973 Tarport Conaway arrived at Freehold Raceway.

21. At 8:00 A.M., that morning, Tarport Conaway was examined by Dr. S. P. Dey, D.V.M., and was found to have tendinitis (swelling of the tendons) in both front legs.

22. The cause of the tendinitis was not determined, however, it could have been caused by incidents during shipping.

23. After learning of the tendinitis, Sessa called Riegle, asked him to take the horse back and return the purchase price.

24. Riegle could not believe there was anything wrong with Tarport Conaway and said he would come to Freehold to examine the horse.

25. On March 26, 1973 Riegle came to Freehold Raceway accompanied by Maloney to see Tarport Conaway.

26. It was apparent to both men that the horse was being kept in unclean physical surroundings.

27. By March 26, 1973, Tarport Conaway had recovered from tendinitis. When jogged by Richard Sessa for Riegle and Maloney, the horse jogged normally.

28. Expert medical testimony did not establish that the tendinitis was present on or before March 23, 1973.

29. Subsequently, on March 29, 1973, Tarport Conaway went lame in his hind legs while being jogged on the track at Freehold Raceway.

30. This lameness resulted from "intermittent claudication," a condition created by the stoppage of the flow of blood through the arteries.

31. Intermittent claudication is a result of a thrombosis or blockage of the arteries supplying fresh blood to an area.

32. The intermittent claudication in Tarport Conaway resulted from a thrombosis of the left and right iliac arteries which provide the main blood supply to the hind limbs.

33. None of the medical experts who testified was able to identify the cause of the thrombosis in Tarport Conaway. One

main known cause of a thrombosis in a horse's artery is the invasion of and attachment to the arterial walls of the third-stage larvae of the strongylus vulgaris worm, causing an irritation against which the horse reacts by deposition of fibrous tissue in an attempt to wall off the internal parasite. The fibrous tissue builds up inside the artery and ultimately forms a blockage.

There are, however, other known causes for thrombosis in a horse's artery. In addition, a thrombosis can arise without known cause.

34. Expert medical testimony did not establish that the thrombosis was present in Tarport Conaway on or before March 23, 1973.

35. On March 29, 1973, after receiving the report from Dr. Dey that Tarport Conaway had intermittent claudication in the hind limbs, Sessa again called Riegle and asked him to take the horse back and return the purchase money.

36. This Riegle refused to do.

37. There is no immediate cure for thrombosis of the iliac arteries in a horse. The disease is treatable by time and rest.

38. In general, a horse afflicted with a thrombosis of the iliac arteries is unable to race to the potential shown prior to the affliction.

39. In order to treat Tarport Conaway, Sessa sent him to a farm near Dover, Delaware to be turned out for one year.

40. After one year, the horse was put in training for five months but did not race.

41. Tarport Conaway was again turned out, first at Linden Creek Farm near Pittsburgh and then at Green Valley Training Center in Maryland.

42. Tarport Conaway was put back into training in March of 1975.

43. Between June 6, 1975 and December 29, 1975, the date of trial, Tarport Conaway raced 13 times, winning 3 races and earning a total of $1306.00.

44. Between March 24, 1973, the date of Tarport Conaway's arrival at Freehold, through December 29, 1975, the date of trial, Sessa incurred necessary expenses for the horse's transportation, maintenance, training and veterinary care in the amount of $9073.00.

45. Because of his excellent blood lines and early racing record, Tarport Conaway may have substantial value for breeding purposes.

## DISCUSSION

As previously stated, this is an action to recover damages for breach of warranties on the sale of a three year old standardbred race horse. Plaintiff buyer contends that the defendant seller breached express warranties, an implied warranty to merchantability and an implied warranty of fitness for particular purpose.

### I. *Law Applicable to the Sale.*

This case involved a sale of livestock to which Article 2 of the Uniform Commercial Code applies. See U.C.C. §§ 2–102, 2–105, 12A P.S. §§ 2–102, 2–105. By stipulation of the parties, the Uniform Commercial Code as adopted and interpreted in Pennsylvania, 12A P.S. § 1–101 et seq., will be applicable to this sale.

### II. *Express Warranties.*

On March 10, 1973, the day of the sale of Tarport Conaway, Sessa and Riegle had a telephone conversation during which the horse was discussed in general terms. Arrangements were made for transportation, and Riegle gave Sessa some instructions for driving Tarport Conaway based on Riegle's experience with him. Sessa contends that certain statements made by Riegle during that conversation constitute express warranties on which Riegle is liable in this action. The most important of these is Riegle's alleged statement that, "the horse is sound," or words to that effect.[1]

---

1. Sessa also cites the statement, "Tarport Conaway can leave like a deer, take a forward position, and if you brush him from the head of the stretch home, he would just jog home in preferred company every week."

In deciding whether statements by a seller constitute express warranties, the Court must look to U.C.C. § 2–213[2] which presents three fundamental issues. First, the Court must determine whether the seller's statement constitutes an "affirmation of fact or promise" or "description of the goods" under § 2–313(1)(a) or (b) or whether it is rather "merely the seller's opinion or commendation of the goods" under § 2–313(2). Second, assuming the Court finds the language used susceptible to creation of a warranty, it must then be determined whether the statement was "part of the basis of the bargain." If it was, an express warranty exists and, as the third issue, the Court must determine whether the warranty was breached.

With respect to the first issue, the Court finds that in the circumstances of this case, words to the effect that "The horse is sound" spoken during the telephone conversation between Sessa and Riegle constitute an opinion or commendation rather than express warranty. This determination is a question for the trier of fact.[3] *Gillette Dairy, Inc. v. Hydrotex Industries, Inc.*, 440 F.2d 969 (8th Cir. 1971); *Brunner v. Jensen*, 215 Kan. 416, 524 P.2d 1175 (1974). There is nothing talismanic or thaumaturgic about the use of the word "sound." Whether use of that language constitutes warranty, or mere opinion or commendation depends on the circumstances of the sale and the type of goods sold. While § 2–313 makes it clear that no specific words need be used and no specific intent need be present, not every statement by a seller is an express warranty.

Several older Pennsylvania cases dealing with horse sales show that similar statements as to soundness are not always similarly treated under warranty law. In *Wilkinson v. Stettler*, 46 Pa.Super. 407 (1911), the statement that a horse "was solid and sound and would work any place" was held not to constitute an express warranty. This result was followed in *Walker v. Kirk*, 72 Pa.Super. 534 (1919) which considered the statement, "This mare is sound and all right and a good worker double." *Walker* was decided after the passage of § 12 of the Uniform Sales Act,[4] the precursor of U.C.C. § 2–313 and thus presumably rests on the standard there established. The Official Comments to U.C.C. § 2–313 indicate that no changes in the law of warranties under Uniform Sales Act § 12 were intended.

However, in *Flood v. Yeager*, 52 Pa.Super. 637 (1912) an express warranty was found where the plaintiff informed the defendant that, "he did not know anything at all about a horse and that he did not want . . . the defendant to make a mean deal with him; whereupon the defendant said that the horse was solid and sound;

---

as an express warranty. However, this statement is instruction on driving based on Riegle's experience and constitutes merely an opinion, not an express warranty. Sessa cites other statements as express warranties. However, the credible evidence does not establish that these statements were in fact made.

**2.** U.C.C. § 2–313, 12A P.S. § 2–313 provides in pertinent part:
(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

**3.** The Court is aware that in *Norton v. Lindsay*, 350 F.2d 46 (10th Cir. 1965), statements as to a horse's soundness were held to be express warranties. However, the facts are sufficiently difficult in the case at bar to warrant an opposite finding.

**4.** P.L. 543 § 12, May 19, 1915, former 69 P.S. § 121.

that he would guarantee him to be solid and sound" 52 Pa.Super. at 638. While all three of these cases are premised partly on the now displaced rule that specific intent to warrant is a necessary concomitant of an express warranty,[5] they do show that statements of the same tenor receive varying treatment depending on the surrounding circumstances.

The results in these cases are all consistent with custom among horse traders as alluded to by Gene Riegle.[6] He testified that it is "not a common thing" to guarantee a horse, that he has never guaranteed a horse unless he had an "understanding" with the buyer and that he did not guarantee Tarport Conaway.[7] In other words, because horses are fragile creatures, susceptible to myriad maladies, detectable and undetectable, only where there is an "understanding"[8] that an ignorant buyer, is relying totally on a knowledgeable seller not "to make a mean deal," are statements as to soundness taken to be anything more than the seller's opinion or commendation.

The facts suggest no special "understanding" between Sessa and Riegle. Sessa was a knowledgeable buyer, having been involved with standardbreds for some years. Also, Sessa sent Maloney, an even more knowledgeable horseman, as his agent to inspect the horse.

Also militating against the finding of express warranty is the nature of the conversation between Sessa and Riegle. It seemed largely collateral to the sale rather than an essential part of it. Although Sessa testified that Riegle's "personal guarantee" given during the conversation was the quintessence of the sale, the credible evidence suggests otherwise. While on the telephone, Riegle made statements to the effect that "the horse is a good one" and "you will like him." These bland statements are obviously opinion or commenda-

tion, and the statement, "The horse is sound," falling within their penumbra takes on their character as such.

Under all the facts and circumstances of this case, it is clear to the Court that Riegle's statements were not of such a character as to give rise to express warranties under § 2–313(1) but were opinion or commendation under § 2–313(2).

Even assuming that Riegle's statements could be express warranties, it is not clear that they were "part of the basis of the bargain", the second requisite of § 2–313. This is essentially a reliance requirement and is inextricably intertwined with the initial determination as to whether given language may constitute an express warranty since affirmations, promises and descriptions tend to become part of the basis of the bargain. It was the intention of the drafters of the U.C.C. not to require a strong showing of reliance. In fact, they envisioned that all statements of the seller became part of the basis of the bargain unless clear affirmative proof is shown to the contrary. See Official Comments 3 and 8 to U.C.C. § 2–313, 12A P.S. § 2–313.

It is Sessa's contention that his conversation with Riegle was the principal factor inducing him to enter the bargain. He would have the Court believe that Maloney was merely a messenger to deliver the check. The evidence shows, however, that Sessa was relying primarily on Maloney to advise him in connection with the sale. Maloney testified that he had talked to Sessa about the horse on several occasions and expressed the opinion that he was convinced "beyond the shadow of a doubt" that he was a good buy. With respect to his authority to buy the horse he testified

"Well, Mr. Sessa said he had enough confidence and faith in me and my integrity and honesty that I, what I did say about

---

**5.** See U.C.C. § 2–313, Official Comment 3, 12A P.S. § 2–313.

**6.** U.C.C. § 1–205(3), 12A P.S. § 1–205(3) permits the Court to consider usage of trade in determining the content of the agreement between Sessa and Riegle.

**7.** N.T. at 280–81.

**8.** As in *Flood v. Yeager, supra,* for example.

the horse, I was representing the horse as he is or as he was, and that if the horse, in my estimation, was that type of a horse and at that given price, the fixed price of $25,000. he would buy the horse."[9]

When, at the airport, Maloney protested that he did not want to accept full responsibility to go to Ohio alone, Sessa told him " . . . I take your word. I—I trust your judgment and I trust your—your honesty, that if this horse is right, everything will be all right."[10] In Ohio, Maloney examined the horse, jogged him and reported to Sessa over the telephone that he "liked him."

The Court believes that Maloney's opinion was the principal, if not the only, factor which motivated Sessa to purchase the horse. The conversation with Riegle played a negligible role in his decision.

■ Even assuming that an express warranty was made, for plaintiff to recover, the issue of whether there had been a breach of the warranty must be resolved in his favor. In connection with this determination, it must first be determined who bears the burden of proof. U.C.C. § 2–607(4)[11] places the burden of proof of breach of warranty on the buyer (here the plaintiff) with respect to any goods "accept-

ed." If the goods were not "accepted," the seller would have the burden of showing that they conform to the contract. Thus, incidence of the burden of proof here depends on whether Sessa "accepted" the horse within the meaning of the U.C.C. U.C.C. § 2–606[12] defines acceptance. Under § 2–606(1)(a), Sessa accepted Tarport Conaway through his agent Maloney on March 10, 1973. At that time, Maloney was permitted unlimited inspection and both Sessa and Maloney indicated that Sessa would take the horse. Sessa contends that there has been no acceptance and that the telephone calls after the horse was shipped (Findings of fact 23 and 35) constitute effective rejection. However, U.C.C. § 2–607 provides that "Acceptance of goods by the buyer precludes rejection of the goods accepted". Since Sessa could not make an effective rejection, the burden of proof of the breach of warranty rests on him as the buyer.[13]

■ This conclusion is not changed by the fact that the horse was not shipped until March 23, 1973. On March 10, 1973, Riegle tendered delivery of the horse in accordance with U.C.C. § 2–503[14] by putting and holding him at Sessa's disposal. Testimony shows that the parties' initial understanding was that transportation of

---

9. N.T. at 94.

10. N.T. at 97.

11. U.C.C. § 2–607(4), 12A P.S. § 2–607(4) provides that,
> The burden is on the buyer to establish any breach with respect to the goods accepted.

12. U.C.C. § 2–606, 12 P.S. § 2–606 provides:
> (1) Acceptance of goods occurs when the buyer
> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
> (b) fails to make an effective rejection (subsection (1) of Section 2–602, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

13. While Sessa could invoke the remedy of revocation of acceptance under U.C.C. § 2–608, 12A P.S. § 2–608, incidence of the burden of proof would not be affected.

14. U.C.C. § 2–503(1), 12 P.S. § 2–503(1) provides:
> (1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article, and in particular
> (a) tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession; but
> (b) unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods.

the horse was to be Sessa's responsibility. However, when Sessa was unable to get a van, Riegle was authorized to arrange for one.[15] Consequently, the contract of sale authorized Riegle to ship the goods, but did not require delivery at a particular destination.

■ While not relevant to incidence of the burden of proof, the delay in shipment does shift the relevant date for determining breach of warranty. U.C.C. § 2–509 [16] provides that the risk of loss shifts to the buyer when the seller delivers the goods to the carrier. In this case, Riegle delivered the goods to the carrier on March 23, 1973 for shipment to Freehold, New Jersey. Thus, any defects which existed on that date would breach the warranty, but any which arose thereafter would not. *Miron v. Yonkers Raceway, Inc.,* 400 F.2d 112 (2d Cir. 1968); *Strauss v. West,* 100 R.I. 388, 216 A.2d 366 (1966).

■■ The issue for the Court therefore becomes whether plaintiff sustained his burden of proving that defects in Tarport Conaway existed on March 23, 1973. Two separate defects are alleged:

1. That the horse had tendinitis.
2. That the horse had a thrombosis of the iliac artery causing intermittent claudication.

First, with respect to the tendinitis, Sessa clearly did not carry the burden. The Rie-

gles testified that the horse received proper care between March 10 and March 23, 1973 and was put on the van in sound condition. Further, the expert testimony conceded that injury on the van could have caused the tendinitis. See also *Strauss v. West, supra.* The evidence produced by plaintiff which is alleged to indicate treatment for tendinitis before March 23 (scarff on the horse's legs) was shown to be equally consistent with normal leg care for a race horse. Moreover, even if the tendinitis had pre-existed March 23, it cleared up in a few days and the horse's legs returned to normal. It was not a substantial defect and would not give rise to a breach of warranty.

■ The alleged thrombosis of the iliac artery poses a much more complex problem. There is no question that Tarport Conaway had a thrombosis of the iliac arteries after March 23, 1973, but no evidence conclusively establishes the cause. Experts testified that the main known cause of thrombosis in horses is invasion of the blood vessel wall by third stage larvae of the strongylus vulgaris worm, but that there are other known and unknown causes. Although the experts testified that *if* the thrombosis was caused by strongyle larvae, it would have been present before March 23, 1973 because of the progressive nature of this affliction, no expert could testify to a reasonable medical certainty that Tarport Conaway's thrombosis was so caused. Some of the circum-

---

**15.** N.T. at 283–84:

Riegle testified:
A Before I hung up that day on March the 10th of 1973 I do require—or, Maloney required me to hold the check until the check clears and Mr. "Sessna" then was supposed to send a truck then to get the horse.

\* \* \* \* \* \*

Q Subsequent to this call Mr. Sessa called you about shipping?
A Repeat the question.
Q After the phone call on March 10 did he call you later in the day about shipping?
A Yes.
   He couldn't get a truck at that time, I think he told me, from the trucks coming up from the South, and which I knowed was very difficult, and which I have the same trouble at that time of the year from the—all the ICC carriers hauling horses to Florida.
Q And did you obtain the truck?

A I did after he requested it.
Q And who was that? Who was the carrier?
A Dunmar Trucking, Plain City, Ohio, an ICC carrier.
Q And did you ship the horse?
A Yes.
Q When was that?
A I think it was March the 23rd of the morning, 1973.

**16.** U.C.C. § 2–509(1), 12A P.S. § 2–509(1) provides:

(1) Where the contract requires or authorizes the seller to ship the goods by carrier (a) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation . . . .

stances tend to show that it was not so caused.

First, there was undisputed testimony that Tarport Conaway was regularly wormed. According to this testimony, all horses have worms to some degree. They ingest the worm eggs, which have been spread by the feces of other horses, on grass and other foods. The worms hatch and go through their life cycle inside the horse during which they lay eggs which pass out in feces. Regular worming significantly reduces the worm population in a horse and renders it unlikely that worms would cause a thrombosis. In addition, none of the veterinary examinations showed the presence of strongylus vulgaris larvae.

Second, no early symptoms of intermittent claudication were observed. Tarport Conaway's regular veterinarian before the sale testified that he saw him jog almost every Thursday up to the time of sale and observed no early symptoms such as holding the hind leg out to the side after jogging, coldness or lack of pulsation.[17]

For these reasons, the Court believes that plaintiff failed to carry the burden of proof by a preponderance of the evidence that any warranties which might have been made were breached. Pennsylvania law demands that the burden of proof be met with more than conjecture. *Vlases v. Montgomery Ward & Co.,* 377 F.2d 846 (3d Cir.), *Kirshon v. Friedman,* 349 Pa. 171, 36 A.2d 647 (1944). There must be evidence sufficient to convince the finder of fact that plaintiff's contention is more likely true than not. The evidence in this case fails to convince the Court that it is more likely

than not that the thrombosis in Tarport Conaway was caused by strongylus vulgaris worms. It is equally consistent with the evidence that it arose from another known cause or an unknown cause.

For the foregoing reasons, plaintiff cannot recover on the basis of express warranties.

III. Implied Warranty of Merchantability.

Plaintiff also seeks relief based on the implied warranty of merchantability of U.C.C. § 2–314(1).[18] The key words in this section are "merchant" and "merchantable." To recover, plaintiff must show that the seller was a "merchant" and that the goods were not "merchantable" at the time of sale.

In this case there can be no question that Riegle was a merchant. He bought, sold and raced horses for a living. However, because the Court finds that Tarport Conaway was merchantable at the time of sale, plaintiff cannot recover. First, in accordance with the analysis above, plaintiff failed to prove that any defect in Tarport Conaway was present on March 23, 1973. Second, even assuming that the defects alleged were present, the horse would still be merchantable.

U.C.C. § 2–314(2) defines merchantable.[19] The standard established does not require that goods be outstanding or superior. It is only necessary that they be of reasonable quality within expected variations and fit for the ordinary purposes for which they are used. *Schneider v. Chrysler*

---

17. N.T. at 272.

18. U.C.C. § 2–314(1), 12A P.S. § 2–314(1), provides in part:
    (1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

19. U.C.C. § 2–314(2), 12A P.S. § 2–314(2) provides:
    (2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and
(b) in the case of fungible goods, are of fair average quality within the description; and
(c) are fit for the ordinary purposes for which such goods are used; and
(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.

*Motors Corp.,* 401 F.2d 549 (8th Cir. 1968); *Jakubowski v. Minnesota Mining & Manufacturing Co.,* 42 N.J. 177, 199 A.2d 826 (1964); *Eimco Corp. v. Joseph Lombardi & Sons,* 193 Pa.Super 1, 162 A.2d 263 (1960).

Even with tendinitis and intermittent claudication Tarport Conaway met this standard. The tendinitis was merely temporary and of no long term effect. The intermittent claudication did not prevent him from becoming a creditable if unspectacular race horse. After rest and recuperation, he won three races in thirteen starts in 1975. Certainly he did not live up to Sessa's hopes for a preferred pacer, but such disappointments are an age old story in the horse racing business. Anyone who dares to deal in standardbreds knows that whether you pay $2500.00 or $250,000.00, a given horse may prove to be a second Hambletonian or a humble hayburner. Consequently, since Tarport Conaway was able to hold his own with other standardbreds, he was reasonably fit for the ordinary purposes for which race horses are used, and was merchantable.

IV. Implied Warranty of Fitness for Particular Purpose.

Sessa's final theory of recovery is for breach of the implied warranty of fitness for particular purpose of U.C.C. § 2–315.[20] In accordance with the analysis above the Court finds that there was no proof of breach of such a warranty. Moreover, in the circumstances of this case, no such warranty should be implied.

One of the principle requirements of the implied warranty of fitness for particular purpose is that, "the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *McMeekin v. Gimbel Brothers, Inc.,* 223 F.Supp. 896 (W.D.Pa. 1963); See Official Comment 1 to U.C.C. § 2–315, 12A P.S. § 2–315. This element is clearly not present on the facts of this case

and prevents a recovery by Sessa. Sessa's own testimony shows that from the first he was relying on Maloney, his agent, to select a horse for him. Maloney selected 4 or 5 of Riegle's horses which he would consider for himself and Sessa, and held Sessa's trust and authority to do so. Riegle did no more than sell the horse Maloney had selected.

For the foregoing reasons, plaintiff cannot recover in this case and judgment will be entered for defendants.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332.

2. By stipulation of the parties, the law of Pennsylvania applies in this case.

3. Defendants are not liable to plaintiffs for breach of express warranties under § 2–313 of the Uniform Commercial Code, 12A P.S. § 2–313.

4. Defendants are not liable to plaintiffs for breach of the implied warranty of merchantability of § 2–314 of the Uniform Commercial Code, 12A P.S. § 2–314.

5. Defendants are not liable to plaintiff for breach of the implied warranty of fitness for particular purpose of § 2–315 of the Uniform Commercial Code, 12A P.S. § 2–315.

6. Judgment will be entered for defendants.

---

20. U.C.C. § 2–315, 12A P.S. § 2–315 provides: Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judg- ment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.