James PRATT and Mary Jane Pratt, Plaintiffs,

v.

WINNEBAGO INDUSTRIES, INC. and Gene Norris Oldsmobile, Inc., Defendants,

v.

GENERAL MOTORS CORPORATION, Third-Party Defendant.

Civ. A. No. 77–146 ERIE.

United States District Court, W. D. Pennsylvania.

Jan. 12, 1979.

John C. Brydon, Erie, Pa., for plaintiffs.

Andrew J. Conner, Erie, Pa., for Winnebago.

Lawrence C. Bolla, Erie, Pa., for Gene Norris.

James A. Mollica, Jr., Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for General Motors Corp.

## OPINION

WEBER, Chief Judge.

This is a civil proceeding arising out of the sale of a motor home to the Plaintiffs with jurisdiction founded on the involvement of a federal question and diversity of citizenship. Based upon the evidence adduced at the non-jury trial held on June 7–9 and on August 18, 1978, and on the briefs on the legal issues submitted by all parties, it is the judgment of the Court that the Plaintiffs are not entitled to recover.

The Plaintiffs, James and Mary Jane Pratt, are residents of the State of Pennsylvania, and the Defendants Winnebago Industries, Inc. ("Winnebago"), and Gene Norris Oldsmobile, Inc. ("Gene Norris" or the "Norris Agency") are corporations organized and existing under the laws of a state other than Pennsylvania. The amount in controversy exceeds $10,000. General Motors Corporation ("GM") is a third-party defendant.

The Plaintiffs reside in Erie, Pennsylvania, and the dealer, Gene Norris Oldsmobile is near Cleveland, Ohio, over 100 miles distant. Many of the complications in this case revolve around this distance and the consequences of bringing the vehicle into another state after purchase from the dealer.

The Pratts bought a 17′ Itasca motor home from Defendant Gene Norris Oldsmobile in July 1977 for $16,745. Winnebago manufactured the motor home in August 1976 on a chassis manufactured by General Motors.[1] Larry Wood of the Norris Agency delivered the motor home to the Pratts at their home in Erie, Pennsylvania, using Ohio dealer's temporary registration plates, on August 3, 1977. Within four days after delivery, the Pratts tried to use the motor home two or three times. As a result of these trips, they had a number of complaints about the motor home—ranging in severity from a transmission which would operate the vehicle only in a backward direction to a chipped turning signal light.[2] On or about August 10, 1977, GM arranged to pick up the Pratts' motor home and tow it to Dave Hallman's Chevrolet agency in Erie for the replacement of the transmission and an inspection and adjustment of the brakes, which Mr. Pratt claims were "spongy" with excessive pedal travel. While the Hallman agency was repairing the transmission on their motor home, Winnebago supplied the Pratts on or about August 17, 1977, at their request with a "loaner" vehicle which the Pratts used extensively for more than four weeks. At no time did the Pratts attempt to register the vehicle in Pennsylvania.

The Hallman agency finished replacing the transmission and checking the brakes on or about September 10, 1977. Sometime before these repairs were finished, the Pratts decided that they no longer wanted their motor home and asked Winnebago and the Gene Norris Agency for a replacement vehicle or their money back. The Norris Agency agreed to replace the motor home with a slightly more expensive model if the Pratts would pay the difference in value between the motor home they purchased and the new one. The Pratts refused.

---

1. The chassis includes the engine, frame, brakes, transmission and steering mechanism.

2. The Plaintiffs listed the following complaints: faulty transmission which prevented the motor home from being driven in a forward direction; excessive brake travel which discouraged the Plaintiffs from operating the motor home; a leaking roof in the kitchen area; leak of air-conditioning fluid; oil leaks from lighting system support generator; faulty generator operation; failure of driver's seat to lock securely in normal driving position; faulty cab air conditioner; engine hesitation; absence of windshield washer unit; fluid leaks from power steering hoses; loose wiring terminals on furnace gas valve controls; damaged trim panel between engine and dash board; windshield wipers do not complete stroke; sharp edges on cable hole in power steering area; broken plastic drawer guides on drawers; loosely fastened clearance light by radio antenna; chipped turning signal lens; certain overhead cabinet doors do not remain shut; scraped rear bumper: (Defendant Winnebago Exhibit 2).

General Motors, the Gene Norris Agency, and Winnebago stood ready to repair all of the defects with the motor home which the Pratts had itemized. At trial, representatives of General Motors estimated that the complaints related to the chassis could be remedied in a few hours at a cost of only $78 to GM. Representatives of Winnebago estimated that the rest of the complaints could be repaired in only two or three days of labor time and a cost of about $400 to Winnebago or Gene Norris.[3] The Plaintiffs did not attempt to rebut the evidence.

Aside from the replacement of the transmission, no Defendant had an opportunity to repair the motor home. From the time the motor home was purchased, Gene Norris and Winnebago offered to repair the defects which the Pratts had itemized on the premises of the Gene Norris Agency in Middleburg Heights, Ohio, near Cleveland, if the Pratts would transport the motor home back to the agency. At trial, Mr. Gene Norris, President of the Norris Agency, testified that he would still repair the motor home.

The Pratts had driven to Middleburg Heights to select the motor home before they bought it and they could anticipate that the vehicle would inevitably require some repairs and that they would be responsible for transporting the motor home to Middleburg Heights, Ohio, so that the repairs could be completed. The terms of the Winnebago warranty, which the Pratts signed, require the Pratts to return the vehicle to the Norris Agency or some other authorized Winnebago dealer for repairs. (Plaintiffs' Exhibit 2.)

Even though the Pratts had decided by the time that the Hallman Agency completed the replacement of the transmission that they no longer wanted this vehicle, they continued to use the loaner which Winnebago had supplied. They have contended that they could not transport their motor home back to Ohio for the necessary repairs for two reasons: (1) the brakes on the motor home were unsafe and that they did not wish to incur the $300 charge to have the vehicle towed back to the Norris Agency; (2) the 30 day temporary Ohio dealer license plates which the Norris Agency had supplied had expired and they did not wish to pay the $1,200 sales tax necessary to register their vehicle in Pennsylvania and obtain Pennsylvania license plates because they no longer wished to own the motor home which they had purchased.

The Plaintiffs' complaint about the safety of the motor home's brakes involves principally their feeling that the brakes' pedal travel was excessive, namely, the amount the brake pedal had to be depressed from its undepressed position to the point necessary to stop the vehicle. Plaintiff James Pratt testified that he first discovered the brake problem on the day of delivery, August 3, 1977, when he took several people for a ride. Despite the alleged concern about the excessive pedal travel, the Plaintiffs embarked on a trip to West Virginia only two days later.

The evidence generally indicates that the brakes were safe even if the pedal travel was slightly greater than normal. James Marsh, an employee of the Norris Agency, testified that he drove the motor home before it was delivered to the Pratts and that brakes seemed normal. Larry Wood, a salesman for the Norris Agency, drove the motor home in the Cleveland area and drove the motor home from Cleveland to the Pratts' home in Erie. Mr. Wood testified that the brakes worked fine at all times and encountered no braking difficulty. An employee of Hallman's Chevrolet who replaced the transmission also checked the brakes pursuant to Mr. Pratt's request and indicated in his worksheet that the brakes were "O.K." (Plaintiffs' Exhibit 4). Finally, W. E. Lent, area service manager for GM's Chevrolet Division, inspected the Pratts' motor home in April 1978 and drove the motor home a short distance. He found that the brake travelled 70% of the distance

---

**3.** The carpet of the motor home may require replacement at a cost of an additional $150–200.

from its undepressed position to the floor and, although this travel is greater than normal for the particular type of vehicle involved, it did not impair the stopping power of the brakes. Mr. Lent further testified that the motor home was safe to drive to Cleveland. Louis Caltenstein, another Gene Norris employee, testified that he had driven the motor home before it was delivered and found the brakes satisfactory. Thomas Wnek, a mechanic who examined the Pratts' vehicle in April 1978, testified that the brake pedal would drop to the floor and that he would thus not pass the motor home if he were inspecting for a Pennsylvania inspection. Mr. Wnek also testified that the brake pedal travelled about 75% of the distance from its undepressed position to the floor, thus contradicting his earlier testimony that the motor home should not be driven because the pedal dropped all the way to floor when depressed. On balance, the Court concludes that essence of the Pratts' complaint about the brakes goes to their personal dissatisfaction with the distance of the pedal travel, which Mr. Lent testified can be adjusted in 1.5 hours at a cost of only $22.50 to General Motors. The overwhelming evidence indicates that several knowledgeable automotive professionals drove the Pratts' motor home both long and short distances without accident, incident or complaint. For these reasons, we cannot conclude that the Pratts' unwillingness to return the motor home to the Norris Agency for repairs was reasonable. The Norris Agency offered to transport the motor home back to Cleveland for repairs after the Complaint in this case was filed, but the Pratts refused this offer and insisted on the return of their money.

Second, the Plaintiffs' unwillingness to pay a $1,200 sales tax for a Pennsylvania license plate for a motor home they no longer wanted does not justify their failure to give the Defendants a full and complete opportunity to repair their motor home but rather seems only an excuse for their desire for a refund of their money. This reason is undercut by the Norris Agency's offer to tow the motor home back to Ohio at its own expense. In sum, with the exception of the transmission and brakes, the Defendants did not have an opportunity to repair the defects with the motor home.

The Plaintiffs seek rescission of the contract and refund of their purchase money under two theories of liability: (1) The Magnuson–Moss Consumer Product Warranties Act, 15 U.S.C.A. § 2301, et seq. (Supp.1978); and (2) various sales provisions of the Uniform Commercial Code as adopted by Pennsylvania, 12A Pa.Stat.Ann. §§ 2–606, 2–608 (Purdon 1970).

■ The Plaintiffs contend that they are entitled to a refund of their purchase money under 15 U.S.C.A. § 2304(a)(4) of the recently enacted Magnuson Moss Act, which provides:

> In order for a warrantor warranting a consumer product by means of a written warranty to meet the Federal minimum standards for warranty—

> 4) if the product (or a component part thereof) contains a defect or malfunction after a reasonable number of attempts by the warrantor to remedy defects or malfunctions in such product, such warrantor must permit the consumer to elect either a refund for, or replacement without charge of, such product or part (as the case may be). . . .

The statute specifies with utter clarity that a consumer has the right to elect to receive a refund only if the product has defects which survive a reasonable number of attempts by the warrantor to repair them. Except for their successful repair of the transmission, the Defendants in this case have not had a single opportunity to repair the Plaintiffs' motor home. Before the vehicle was even returned from the Hallman agency and while the Plaintiffs were using the "loaner" vehicle supplied by Winnebago at their request, the Plaintiffs had decided that they no longer wanted the motor home. Plaintiffs, by not paying the Pennsylvania sales tax and securing the Pennsylvania registration plates, have created their own obstacle to the return of the vehicle to the dealer's garage.

■ Finally, the Plaintiffs contend that under 15 U.S.C.A. § 2304(b)(1) the Plaintiffs are required only to notify Gene Norris of the defects and cannot be required to return the motor home to Cleveland for repairs. We do not believe that, in this case, the responsibility of the Plaintiffs to return the motor home to Ohio for repairs is an impermissible duty under 15 U.S.C.A. § 2304(b)(1). First, the Plaintiffs bought the motor home in Ohio and have testified that they knew that they would have to return the motor home to Ohio for repairs and regular maintenance. Second, the drafters of the Magnuson Moss Act clearly contemplated that written warranties could be conditioned upon the obligation of consumers to return the defective item to its place of purchase for repair, see 15 U.S.C.A. § 2302(a)(5). Both the Itasca and General Motors' warranties obligate the Plaintiffs to transport the motor home to the selling dealer or other authorized Itasca or Chevrolet dealer for repairs covered by the warranties. (Plaintiffs' Exhibits 2 and 3). The Plaintiffs' reasoning would require faraway dealers to incur the expense of transporting motor homes from the owner's residence for repair. To so interpret the Magnuson Moss Act would impose an unfair and unreasonable burden on dealers.

In short, we find that the Plaintiffs are not entitled to rescission under 15 U.S.C.A. § 2304(a)(4) because the Defendants did not have the opportunity to make a reasonable number of attempts to repair the vehicle. We also find that the obligation of the Plaintiffs to return their motor home for repairs is a reasonable and necessary incident of owning a motor vehicle which the Plaintiffs in this case voluntarily accepted and does not constitute an impermissible duty under 15 U.S.C.A. § 2304(b)(1).

The second theory of liability advanced by the Plaintiffs involves the application of the sales provisions of the Uniform Commercial Code as adopted by Pennsylvania. In evaluating the Plaintiffs' claim for rescission, the Court is faced with two issues: 1) did the Plaintiffs accept the motor home under 12A Pa.Stat.Ann. § 2–606; and 2) did the Plaintiffs effectively revoke their acceptance under 12A Pa.Stat.Ann. § 2–608?

■ Under Pennsylvania law, acceptance of goods occurs when the buyer either signifies his acceptance to the seller after a reasonable opportunity to inspect the goods or does an act inconsistent with the seller's ownership. 12A Pa.Stat.Ann. § 2–606. There is no doubt that the Plaintiffs accepted the motor home. When they visited Gene Norris's place of business in July 1977, they had a complete opportunity to inspect and test-drive the motor home which they eventually selected. After they were given this opportunity, the Plaintiffs told employees of Gene Norris that they would buy the motor home, and the parties negotiated and agreed upon the terms of the sale. The opportunity to inspect plus agreement on the terms of sales constitutes the acceptance of the motor home by the Plaintiffs. *Sessa v. Riegle*, 427 F.Supp. 760, 767 (E.D. Pa.1977), *aff'd mem.* 568 F.2d 770 (3d Cir. 1978).

■ The Plaintiffs also contend that they effectively revoked any acceptance they made when they notified Gene Norris that they were dissatisfied with the motor home they selected and wanted either a replacement vehicle or their money back. Pennsylvania law allows a buyer to revoke his acceptance of a commercial unit whose non-conformity substantially impairs its value to him if he has accepted it on a reasonable assumption that any non-conformity would be cured and it has not been seasonably cured, 12A Pa.Stat.Ann. § 2–608(1)(a). Revocation under § 2–608 may not take place without a substantial impairment of value. The purpose of requiring a "substantial impairment of value" under § 2–608 is to preclude a buyer from revoking on the basis of trivial defects or defects which may be easily corrected. *Rozmus v. Thompson's Lincoln-Mercury*, 209 Pa.Super. 120, 224 A.2d 782 (1966). In *Rozmus*, the court held that a buyer who bought a new car could not revoke his acceptance of a new car on the basis of the car's emission of smoke and loud noises resulting from problems which could be remedied in a few minutes. Representatives of GM were able to repair the most serious problem with the Pratts' motor home, the faulty transmission, without difficulty and, although the

time for repair was long as compared to the time involved in *Rozmus*, the loaner vehicle supplied by Winnebago greatly reduced, if not eliminated, any inconvenience to the Pratts. A representative of Winnebago testified that the rest of the Pratts' complaints which involved parts covered by the Itasca warranty could be repaired in two or three days at a cost of about $400 to Winnebago. A representative of GM testified that those complaints which involved items covered by the GM warranty could be repaired in a maximum of three and one-half hours of labor time at a cost of less than $100 to GM. We do not believe that complaints of this magnitude, taken individually or together, justify revocation on the grounds that they amount to a substantial impairment of value. Our holding that the alleged defects did not amount to a substantial impairment of value to the Pratts is firmed by the consistent willingness of the Defendants to repair the motor home, to provide them with a replacement vehicle while their home was being repaired, and to transport the motor home to Cleveland for repairs which the Defendants were not obligated to do.

For the reasons set forth above, Judgment is entered for the Defendants on the first party action, and the Third-Party action is hereby dismissed.